Bryan *vs.* Walton, adm'r.

No. 88.—— —— BRYAN, plaintiff in error, *vs.* —— WATSON, administrator of Joseph Nunez, defendant in error.

[1.] Presumptions of *law* and of *fact*, or such as are made by a Jury, may be rebutted by evidence.

[2.] Evidence of general reputation, reputed ownership, public rumor, general notoriety and the like, is original evidence and not hearsay, and is admissible in certain cases.

[3.] A witness may give his belief or opinion when it is in connection with, and a mental deduction from, the facts which come within his knowledge and to which he has deposed.

[4.] If there be two titles to the same property, one by will and the other by descent, and the party elects to claim under the latter, he will not be required to produce the testament on the trial because it has been referred to by witnesses; and all proof as to its contents should be suppressed by the Court.

[5.] A nonsuit will not be awarded where there is sufficient evidence adduced to authorize the Jury to find a verdict.

[6.] Where the plaintiff has made out a *prima facie* case which has been vigorously attacked by the defendant, it is allowable to the plaintiff to introduce additional testimony in support of his title, notwithstanding the same proof might have been adduced on the direct examination.

[7.] Although the judgment of a Court may be irregular, still it may be given in evidence for many purposes.

[8.] The *status* of the African in Georgia, whether bond or free, is such that he has no civil, social or political rights or capacity whatsoever, except such as are bestowed on him by statute.

[9.] Under the Act of 1819, slaves can be transmitted by descent to the illegitimate offspring of the father, provided they be free persons of color, and that, too, whether the mother be a free white woman, an Indian, or a free person of color.

[10.] If the law exacts a duty of a certain class of persons, and prescribes a penalty for the failure or neglect to perform, the fact that it was omitted by an individual and not complained of in the community in which he lived, may be given in evidence, as a circumstance to be weighed by the Jury upon the trial of the issue, as to whether or not he belonged to that class.

[11.] To disable a person from contracting, he must have one-eighth of African blood in his veins.

[12.] Descendants are the posterity of those who have issued from an individual; and include his children, grand-children and their children, to the remotest degree; they form what is called the direct descending line; and the term is opposed to that of ascendants.

Trover, in Houston Superior Court. Tried before Judge Powers, April Term, 1856.

This was an action of trover, brought by defendant in error as administrator of Joseph Nunez, a free person of color, against plaintiff in error, for the recovery of sundry negro slaves.

On the trial, the plaintiff tendered in evidence his letters of administration, in the usual form; and to the reading of which in evidence, defendant's Counsel objected, upon the ground that the face of the letters showed that the administration was upon the estate of a free white person. Whereas, the declaration alleges that the plaintiff was administrator upon the estate of a free person of color, and that the allegation in the declaration and the proof offered did not correspond; which objection was over-ruled; to which decision defendant, by his Counsel, excepted.

Plaintiff then tendered in evidence the testimony of Joseph Bush and Mary Rogers, taken by commission, to the reading of so much of which as went to prove that Joseph Nunez was a free person of color, defendant's Counsel objected, upon the ground that it was incompetent to add to, vary or contradict the aforesaid letters of administration by such testimony; which objection was over-ruled and defendant's Counsel excepted; when said testimony was read to the Jury, as follows: Joseph Bush knows both the parties; Mary Rogers knows Walton, but not Bryan; both witnesses know Joseph Nunez; he died about five years before the taking of their depositions, about 1st January, 1847, near the Savannah river, in Burke County, where he lived at the time of his death; that said Nunez was always regarded a free person of color, and so they believed him to have been; that said Nunez, at his death, had negro property, and that they knew a negro woman by the name of Patience in his possession at and before his death for several years; she was not a very dark negro; between a yellow or mulatto color and dark; she was born, so far as they can recollect, about the year 1822; she

had five children; Sam, the oldest, brown complexion, a boy, and they think, born about the year 1836; Josiah, a boy, two or three years younger than Sam, nearly the same color; Vienna Jeanette, a girl about two years younger than Josiah and of a bright complexion; James, a boy about two years younger than Vienna, and think he was nearly the same color as the boys, but as he was young when they left there, they cannot answer particularly as to that; and Melissa, whom they used to call Toady, a girl not weaned, at the death of Joseph Nunez, and about the same color as the others; that at and before the death of Joseph Nunez, the said Patience and her children belonged to the said Nunez; Patience and all her children above mentioned were born in the possession of Joseph Nunez, and were in his possession until his death; said Nunez inherited neither of the above mentioned children, but raised them in his own house; Joseph Bush says that James Nunez, the father of Joseph, owned Nanny, (who is now alive and hired by Mary Rogers,) the mother of Patience; that James Nunez died about 1809, and at his death left a written will; Nanny went into the possession of Fanny Galphin, sister of the said James Nunez, and while in her possession, had only one child, a boy named Nelson; at the death of Fanny Galphin, about the year 1817, as well as witness recollects, she made a will; the said Nanny was the mother of Patience, and the grand-mother of her children above mentioned, who were all born in the possession of Joseph Nunez; Fanny Galphin died about the year 1817 or 1818, but as well as he can recollect, it was in 1817; if not that year, then the beginning of 1818; thinks that Fanny Galphin's will was made some time about the year 1812; anyhow, some time before her death. Both witnesses testify that Joseph Nunez raised, in his own house, Patience and her children; Joseph Bush says the mother of Patience, Nanny, was in the possession of Fanny Galphin from the death of James Nunez, in 1809, to her death, about 1817; Nanny was born in the family of Jim Nunez, and her mother, Patience, was bought by the said James previous to depo-

nents coming to Georgia in 1798; that James Nunez paid taxes for said Nanny and her mother, Patience, as far back as Joseph Bush recollects; that deponent, as executor of the will of James Nunez, had the taxes paid for Nanny while she was in the possession of Fanny Galphin.

Both witnesses say that Patience and her children were carried from Burke County by Alexander M. Urquhart, Esq. Joseph Bush says that Seaborn C. Bryant, the defendant, came to his house the last fall; (August, September or October, of 1851;) and then stated, he, the defendant, had heard "that the negro Patience, whom Alexander M. Urquhart had carried to Houston was dead, but could'nt certify that she was dead"—his words, as near as deponent remembers; and that Patience's two boys were in the possession of Judge Strong; that Urquhart was supposed to have kidnapped the family he brought, but that he had shown papers sufficiently good to satisfy the people that Urquhart had acted badly and had been compelled to sell some of Patience's children, but he, Bryan, did'nt say to whom he, Urquhart, had sold them.

Bush says that Nanny came into the hands of Joseph Nunez from the possession of Fanny Galphin. Both witnesses say that Fanny Galphin, who was a free person of color, died in Burke County about the year 1817; that she was a paternal aunt of Joseph Nunez. Both know these facts of their own knowledge. By the word *inherit*, both witnesses understand the getting of property by the "*nighest*" blood kin.

James Nunez, they say, was also a free person of color; that Joseph Nunez left no children by any lawful wife; the negroes mentioned in answer to the foregoing interrogatories were his children, by Patience, whom he always claimed as his slave; that he had no *brother or sister*, so far as they know, on the *father or mother's side*, and that the only relation of his they know of is one Charles Nunez, a free person of color, who was a half brother of father James Nunez; neither witness knows who conducts the suit for plaintiff; both say that so far as they know, Mulford Marsh, Esq. of Savan-

nah is the lawyer of Hughes Walton whenever he had any legal business.

Hughes Walton is the only man prosecuting the suit, so far as they know; Mary Rogers says she has in her own possession two of Joseph Nunez's negroes that he gave to her for her lifetime, and that Hughes Walton controls the rest; two of Joseph Bush's daughters—one a daughter, the other a daughter-in-law—present at the giving of these answers; no one has been to see them in behalf of plaintiff; know nothing more that will make in favor of defendant.

Defendant's Counsel objected to so much of the answers of these witnesses as went to show their opinion of the reputation that Nunez was a free person of color; objection over-ruled and defendant excepted. Defendant's Counsel also objected to any evidence of inheritance, it appearing that Joseph Nunez held under written wills of James Nunez and Fanny Galphin without the production of the wills; which objection was over-ruled and defendant's Counsel excepted, the Court rejecting all parol testimony as to the contents of a will, and withholding it from the Jury.

Plaintiff then tendered and read in evidence the testimony of HAMILTON LOCHLIER, taken by commission, as follows: who deposed he knew plaintiff; had seen defendant; also knew deceased; knew Nunez in his lifetime; has never seen him since he died; he died in Burke County; witness saw him for the last time in said county on the night he is said to have died, some time in the winter of 1846; at the time of his death, he resided in said county; was acquainted with negroes of said deceased at the time of his death; among them was a woman named Patience, who had children; witness has seen her children; one named Sam, a boy about 16 years of age; Josiah, a boy about 15; and there were two or three others—some girls—names not known, all smaller than Sam and Josiah; thinks the third one was a girl; Patience is now about 33 years old, a woman a "little lightish"; they were in Joseph Nunez's possession, and witness supposes they belonged to Joseph Nunez or Nunes; (as sometimes spelt;) last

he saw of them was in the city of Augusta; after the death of said Nunez, Alexander H. Urquhart, then of Burke County, took them and removed them from said County some time in the spring (about first of April) after the death of said Nunez; he left, intending to take them, he said, to Alabama, and then on his way, went with them to Augusta.

Patience is worth $500; Sam and Josiah, each $500; can't say as to others; Patience, when witness last saw negroes, was worth about $500; Sam and Josiah, each four hundred; hire of Patience, $60 per annum; Sam and Josiah, each $50; the other three, hardly victuals and clothes, averaging from time witness last saw them until he answered inter'g's (9th Oct. 1851;) knew Alexander H. Urquhart; saw him last in Burke County, in the spring of 1847; does not live there now; knows nothing to benefit plaintiff.

Knows of a deed from Nunez to Urquhart for the negroes in dispute; was called on by Nunez and Urquhart to witness a paper, but did not know at the time what it was; Urquhart afterwards told witness it was a deed, and about four weeks before taking witness' testimony he saw it; did not see Nunez sign or seal it; he only acknowledged he had signed it; witness did subscribe it as a witness, and his wife, B. A. Lochlier, also witnessed its execution; Urquhart did take said negroes, claiming them as his own; he did claim the negroes under the deed; knows nothing more in favor of defendant.

Plaintiff then tendered and read in evidence the answers of BENJAMIN D. HILL to interrogatories, as follows: Witness knows the parties; was present, on the 3d day of April, 1851, in Bryant's field in Houston County. The plaintiff, Jacob Jones, and Samuel Killen, Esq. were also present; the following property was then and there demanded by the plaintiff of the defendant: Patience, a woman, (at the taking of said answers, 9th October, 1851,) 32 or 33 years of age, of dark complexion; Sam, a boy of yellow complexion, then about 16 or 17 years of age, child of said Patience; Josiah, a boy child of said Patience, of copper color, about 15 years

of age; Vienna, a girl child of said Patience, about 13 years old; James, a boy child of said Patience, of yellow complexion, about 10 or 11 years old; Melissa, a girl, child of said Patience, of yellow complexion, about 7 years old; he made the demand in character of administrator of Joseph Nunez, deceased, late of Burke County and said State.   Defendant, at first, neither admitted or denied having the negroes in possession, but said to the plaintiff, "if you were smart you could find out."   The demand was again made, and defendant replied, substantially, the same as at first.

The plaintiff then stated, that the aforesaid negroes were brought from said Burke County, by Alexander H. Urquhart; defendant denied purchasing said negroes from said Urquhart, and said he bought them from another man. Witness then asked defendant's permission to see said woman Patience; defendant replied, "I reckon that's what you never will do," and then went on to state that Urquhart had a deed to Patience and the others aforesaid, which he purchased, and that Urquhart brought them to Houston County.   Witness finally told defendant he had no genuine title, and offered to wager $1.000 on it; at first, he agreed to bet, but subsequently backed out.

Defendant did not show witness or plaintiff the negroes, nor did he give any reason for it; neither admitted or denied possession of them.   He admitted having had possession of them; he said no more about Urquhart's title than previously stated; knew the negroes in Burke County nearly all his lifetime; living close by Nunez; all the time he knew them they belonged to Joseph Nunez of Burke County; so far as he knew, they belonged to him at his death; Nunez, at the time of his death, lived in Burke County; saw the negroes last at Urquhart's house in Burke County; in witness' opinion, their values, at the time of answering the interrogatories, (9th October, 1851,) were, Patience, $600; Sam, $800; Josiah, same as Sam; Vienna, $600; James, $500, and Melissa, $400; their annual value in hire, from the time he last saw them, averaged—Patience, $50; for Ann, Sam

and Josiah, each the same; Vienna, 20 ; the others only victuals and clothes. These values of hire from January, 1847, until 9th October, 1851.

Nunez died in Burke County about 29th December, 1846 ; said negroes left that county in the spring after Nunez died in the winter ; can't say who removed the negroes ; do not know where Urquhart is ; he no longer lives in Burke Co. ; not personally interested ; is the guardian of Charles Nunez, the uncle of Joseph Nunez ; lives in Burke County, over 100 miles from defendant ; travelled to Houston County from his residence, to be a witness for plaintiff in said demand, and all expenses (travelling) were paid by the plaintiff; and if he charges any thing for travelling out to Houston, and his trouble in that, plaintiff is to pay him ; expenses, as stated, have been already paid. It does not depend upon plaintiff's success in the suit, whether witness receives what he may charge for his trouble ; he does not go halves or shares in the recovery.

Defendant did not deny, positively, possession of negroes as stated, but witness did not see them in defendant's possession ; was in the yard of defendant, Nunez had as witness supposes ; his uncle claims it ; he had no lawful children ; he died in Burke County about the 29th of December, 1846 ; his uncle is the nearest relative known to witness.

When the negroes were demanded Bryan did not say he had no such negroes in his possession as those demanded, but did say that Urquhart had a bill of sale or title to such negroes, and brought them there to Houston Co. ; knows nothing more to benefit defendant.

Plaintiff then introduced SAMUEL GURR, who being duly sworn, testified that he saw two of the negroes in defendant's possession, Si and Sam. Defendant said he had the woman Patience and her children in his possession ; he had bought them from Urquhart in the spring of 1847 or 1848 ; the boys were of a brownish color, 12 or 14 years of age ; there were six negroes in all. Defendant gave a negro girl and four

hundred dollars, as he said, for the negroes; the negro girl! was probably worth $400.

Plaintiff then introduced JOHN C. RIDDLE, who being duly sworn, testified that he had seen the negroes; there were five or six of them; the woman rather light colored, not "real black;" she was tolerably likely; don't know her age; worth $500 or $600. Sam and Si were mulattoes, copper colored, are likely; would weigh 75 pounds each. The woman and small children were carried off immediately—one of the boys also—but were afterwards brought back; he supposes Bryan carried them off; does not know why they were sent off; knows they were carried off; saw the man carry them off; does not know that Bryan carried them; saw the Sheriff there about that time; Holcomb carried off the negroes; Bryan traded for them as he heard; the Sheriff came one morning before day, and afterwards, on that morning, Bryan bought them.

The plaintiff then introduced MILES L. GREEN, who being duly sworn, testified, from the description given of the negroes as to their value and the value of their hire, as follows:

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Patience, | worth | $600 | —for hire, | $50 per annum. | | |
| Sam, | " | 1000 | " | " | 100 | " |
| Josiah, | " | 1000 | " | " | 60 | " |
| Vienna, | " | 900 | " | " | 75 | " |
| James, | " | 900 | " | " | 75 | " |
| Melissa, | " | 700 | —nothing for hire. | | | |

The value of the negroes will depend rather upon their health and quality than upon their looks and size. Witness has made these valuations upon the basis that these are average negroes. Negro boys and girls should be ten or twelve years of age before they are put to work.

Here the plaintiff closed his case, and defendant's Counsel moved a non-suit, upon the ground that there was no evidence that the title of Joseph Nunez accrued previous to the Act of 1818, supposing him to be a free person of color, and which Act disabled such free persons from purchasing and acqui-

ring slaves; which motion was over-ruled by the Court, and defendant excepted; and defendant's Counsel having opened his defence to the Jury, tendered and read in evidence the answers of JOSEPH BUSH, to interrogatories sued out for him by the plaintiff in this cause, for the purpose of impeaching his credit; which interrogatories were executed on the 9th day of October, 1841, and the answers read and relied upon as follows:

"Nunez owned and possessed negro property at his death, and one was a woman named Patience. Before his death, he had owned her 12 or 13 years, and obtained her from his aunt, Frances Galphin; he knew Joseph Nunez; he died in Burke County on about the 28th or 29th of December, 1846; he was living in Burke County when he died; Patience had children, viz: Sam, a boy, born in 1836; Josiah, a boy, born in 1838; Vienna, a girl, born in 1841; James, a boy, born in 1843; Melissa, a girl, born in 1845. Sam was of a dark brown; Josiah same; Vienna light brown; James tolerably light, but not as much so as Vienna; Melissa light brown; Patience of a color lighter than black—now about 30 years of age—born in 1821."

Defendant also tendered and read in evidence for a similar purpose, the following answers to other interrogatories, taken by the plaintiff in this cause for Joseph Bush and executed on the 10th day of August, 1852, viz:

"ALEXANDER TELFAIR and witness were executors of said will;" (the will of Jas. Nunez); "it was never proven or admitted to record, by reason of the advice of Major Allen, as stated in the second answer. The negro property was distributed by witness, in accordance with the provisions of the will, but the distributees shortly afterwards exchanged between themselves the property so divided by witness. Witness does not recollect with faithfulness what negroes Joseph Nunez was entitled to under the will, but thinks they were Sam, Polly and Hannah. Witness, however, distinctly recollects that Joseph Nunez exchanged Polly and Hannah for

Nanny and Nelson, negroes belonging, by the will, to Janette Nunez, the neice of Jim Nunez. The distribution took place—witness thinks, in A. D. 1824; it was not in writing; it was verbal. Witness therefore cannot attach a copy of the distribution in writing, as there was none. Joseph Nunez was the son of Jim Nunez, who owned Patience, the mother of the negroes mentioned in the 4th answer, long before witness came to Georgia in 1798. James Nunez left the will as above stated, giving a life estate in the negroes he left to Fanny Galphin his sister—among these negroes was Nanny. After her death the property was to be divided between Joseph Nunez, (the son of said James Nunez,) Janette Nunez his neice, and Alexander Nunez, the brother of said James. By the will, Sam, Polly and Hannah were to be the share of Joseph Nunez, and Nanny and Nelson the share of Janette Nunez. James Nunez died about the year 1810, so far as witness recollects, he paying his funeral expenses as executor. Fanny then came into possession of his property, all the above negroes, and had them in her charge until her death, which witness thinks occurred about the year 1822. Witness then acted as executor of the will of James Nunez, and after settling the debts of the estate, distributed the negroes in accordance with its provisions in the year 1824. Joseph Nunez then exchanged two of his negroes, Polly and Hannah, for two of Janette Nunez—Nanny and Nelson.

Defendant then tendered and read in evidence the interrogatories and answer of Wm. U. Sturges, Clerk of the Superior Court of Burke county, which were introduced; that the copy interrogatories and answers of Joseph Bush thereto attached, was a true copy of the interrogatories and answers of said Bush, the original of which are of file in the Superior Court of Burke county, in certain causes therein pending, viz: Isaiah Carter, adm'r of Francis Galphin *vs.* Alexander G. Fryer. The same *vs.* Benjamin E. Gelstrap. The same *vs.* Mary Rogers, he having been examined as an aged and infirm person, and which interrogatories and answers of the said Sturges it was admitted did prove the above recited facts.

Defendant then read to the Jury so much of the answers of the said JOSEPH BUSH to said interrogatories, from the certified copy thereof attached to the commission of said Sturges as would contradict and impeach him, viz : " He knew James Nunez, now deceased, from about the year 1798 to the year 1813, about which last mentioned year he died.   Witness resided about one mile from said Nunez ; said Nunez died in the county of Burke and State of Georgia, and witness was intimately acquainted with him.   Lucy Anderson was the name by which Joseph Nunez's mother went ; she was afterwards called Lucy Nunez ; she was a free white woman and a very pretty one too.   She and James Nunez lived together as husband and wife.   James Nunez was an American ; his father was a Portuguese ; he passed as a white man.   Witness has frequently seen him writing and acting as a clerk in the counting room of Edward Telfair of Savannah.   Francis Galphin lived on the same plantation, the one now owned by Juriah Harris, 12 years after the death of James Nunez ; she died, witness thinks in 1820.

The last will of Francis Galphin was dated in or about the year 1819, about one year previous to her death ; she made two wills, of which this was the latter.   Witness learned from James Nunez himself that he was a Portuguese and judged the same from his appearance ; and he was generally reputed to be of that nation.

The defendant then offered and read in evidence the testimony of MARY ROGERS, taken by commission, who deposed that she knew the parties ; was well acquainted with Joseph Nunez, his father, Jim Nunez and Joe's mother ; she first knew them in Burke county, in the neighborhood of Demere's ferry, on Savannah river.   It has been forty years or more since she first knew them.   Joseph Nunez's mother was a free white woman ; Jim Nunez, the father of Joe, was of mixed Indian and white blood ; does not think there was any negro blood in Jim Nunez ; he had a mighty red face ; she thinks his blood was as above described.   James Nunez was

the name of Joseph Nunez's father; Jim Nunez had a straight, long nose, thin lips, straight and very black hair, rather a narrow, long face and of a red complexion; he was not a large man, walked trim and nice. Joe Nunez's mother has as pretty a fair skin as any woman has; she had an eye either blue or grey, light colored hair.

Witness thought her a very pretty woman and always treated her as a white woman; been to her house and ate with her and associated with her as a white woman; and so far as witness knows other white women in the neighborhood treated her as such; so far as ever witness has seen or known, Jim Nunez, the father of Joe, was always treated and regarded in the neighborhood as not a negro, or having any negro blood in his veins, but as a respectable Indian and white blooded man; kept as good company as any body in the neighborhood. Witness thinks that Jim was always among respectable white people in the neighborhood in their dances, parties, &c. and was received by them as on a footing with whites. Witness does not remember of a free negro ever having been received and treated in that way by the neighborhood. Witness knows of nothing else that could benefit the defendant.

Witness can say on oath that Joe Nunez had no negro blood in him that she knew of; he was of color, but witness never regarded that color as arising from negro blood. Witness repeats, she does not think Joe Nunez had any negro blood at all in him; she thinks it was Indian and white. Witness never knew of Joe's calling or considering himself a free negro; he had for a wife a negro woman, his own slave. Free negroes in the neighborhood associated in the family of Joseph Nunez, but witness thinks it was because Joe had a negro for his wife. Witness does not think that the neighbors and acquaintances that best knew Joe Nunez spoke of him or regarded him as a free negro, but has heard them say that he was no better than the rest of free negroes, but think they meant this from the way he acted and not because they regarded him as a free negro. Joseph Nunez, at his death,

owned a negro woman named Patience; she had five children; witness thinks three boys and two girls. Patience's mother was named Nanny. Joe Nunez owned Nanny until his death. Joseph Nunez owned Nanny a long time before his death. Patience was born in the possession of Joe Nunez. James Nunez, the father of Joe, owned Nanny before Joseph Nunez owned her. Nanny was born a slave of Jim. Jim Nunez owned Nanny from her birth until his death—how long that period was witness does not well remember, but more than ten years; he owned her at least twenty years before Joe Nunez got the actual possession of her. Jim Nunez owned Nanny before 1818; she belonged to Jim's estate in December, 1818. Nanny always belonged to the estate of Jim Nunez, even while she was in the possession of Fanny Galphin, and during the time of her possession. Nanny was regarded as the property of Joe Nunez. Joe Nunez received Nanny from his father's estate. Witness, of her own knowledge, knows nothing of any will of Jim Nunez; Joseph received said Nanny as an heir and descendant of his father, Jim Nunez. Mr. Bryan has seen witness two or three times in regard to her testimony in this case; the first time was during this summer, perhaps in June or July; the second time was in the latter part of August of this summer; the last time was to-day, yesterday and the day before; he asked witness what she knew about the facts contained in the direct interrogatories; she told him as she has answered to them; he then said he wanted to have her interrogatories taken. No one is present at the taking of these interrogatories.

Witness can see, through the window, Mr. Bryan sitting in the farther end of the piazza; execution of commission dated 21st September, 1854.

Defendant then tendered and read in evidence the testimony of HARRIETT KILPATRICK, taken by commission, who answered: She knows the plaintiff, and has been introduced to a gentleman who calls himself Seaborn C. Bryan; witness knew Joseph Nunez well; he lived in Burke County all his life and died there; witness was well acquainted with the

mother of Joseph Nunez; has staid in her house many a night; she was a free white woman with straight, smooth, black hair; nose not flat; lips not thick; she was very fair skinned for an old woman; witness was acquainted with Jas. Nunez, the father of Joseph, but did not know him very well; he had black and tolerably straight hair, as well as witness remembers; had a nose like a white man—not flat; lips that were not very thick; was a dark complected man, but witness would not say that he was so very dark; witness has seen some white men darker than he was. Witness thinks, from her recollection of the appearance of James Nunez, that he was partly Indian and partly white, but does not think he had any negro blood in him. Jim Nunez, so far as witness remembers, was not called a free negro in the neighborhood, but was regarded as three-quarter blood Indian. Witness has already stated all that she knows which will go to show the race or blood of James Nunez, and of the mother of Joseph Nunez. Witness knows nothing else in favor of defendant.

Witness says, to the best of her belief and judgment, founded on the facts stated in the answer to the second direct interrogatory, Joseph Nunez did not have any negro blood in him; witness does not think that Jim Nunez, the father of Joe had any negro blood in him, but that he was three-fourths Indian and the rest white; to the best of witness' recollection, neither Jim or Joe Nunez were regarded as free negroes, nor did either regard himself as such or act as such; witness knows nothing of the father or mother of Jim Nunez, but formed her opinion of his race from his appearance; the mother of Joe, witness is certain was a white woman, but knows nothing of her father or mother; neither Jim or Joe Nunez ever voted or exercised any of the rights of citizenship, so far as witness knows; does not think they were mulattoes, but they were of dark complexion; Jim Nunez, at his death and before, owned negro property, a part of which descended to Joe Nunez, his son. Nanny, a female slave of Jim Nunez, descended to Joe Nunez. Jim Nunez, at his

death, left a negro boy named Sam, and the above mentioned Nanny; both of them, afterwards, came into the possession of Joseph Nunez. Witness thinks that Jim Nunez owned Nanny at least as early as 1806, but is not certain as to the time. Nanny had children after she came into possession of Joseph Nunez, and before that time too; while she was in possession of Fanny Galphin, Joe's aunt, she had three female children—one named Polly, tolerably bright complected for a negro; she was born while Nanny was in the possession of Joseph Nunez, probably about 1830; Patience, light complected—not a very black negro—born while Nanny was with Joe; witness can't say in what year; the name of the other, witness has forgotten.

Joseph owned Patience and all of her children, (all of whom were born in the possession of Joseph Nunez,) until his death. Witness does not know the names of Patience's children; some were girls and some were boys, but does not know how many were of either sex; thinks Joseph Nunez owned Patience at least twenty years before his death, and her children, from the times of their births, respectively, until his death; the children of James Nunez, including Joseph, were, in 1818 and 1819, living with their aunt, Fanny Galphin, and said Joe then owned and claimed the woman Nanny, as coming to him from his father's estate.

Witness has already stated in her different answers, all she knows; no one present except the commissioners and witness and some children of Mr. Rogers, one of the commissioners.

Defendant then tendered and read in evidence the answers of STEPHEN NEWMAN and MARY HARREL to interrogatories, who testified that they did not know the plaintiff, but have seen a gentleman who says he bears the name of Seaborn C. Bryan; both witnesses knew a man living in Burke County, Georgia, near Shell Bluff or Demere's Ferry, whose name was James Nunez—whether he was the father of Joseph Nunez or not they do not know; both say that the features of James Nunez were those of a man with Indian and white

blood mixed; as to his eyes, nose, lips and cheek bones, they cannot testify with any degree of particularity; they only remember the general effect and appearance of his face, which they say was not that of a negro, but of a white and Indian extraction; his hair was not kinkey, but straight, black and smooth; his action and movements were as genteel as any man witnesses have known; there was no clumsiness about him. Witnesses well remember Jim Nunez's dancing, which was very graceful; many persons tried to catch his step, and nearly all admired its style; both say that Jim Nunez's appearance indicated that he was of Indian and white blood mixed; they did not think he had any negro blood in him at all; he was never regarded by the witnesses or any of the neighborhood as a negro, but so far as witnesses knew, he was always looked upon as Indian and white.

Mary Harrel states, that from the appearance of Jim Nunez's mother, she would suppose there could be little question but that she was a real Indian and no negress. The other witness, Newman, knew nothing about the parents of Jim Nunez, and testifies only from his recollection of his appearance and the esteem in which he was held by the neighborhood. Both witnesses say, that whenever Jim Nunez was staying in this neighborhood at a Mrs. Holmes, he was always received as a respectable person, and very generally liked; he never kept low, trifling or rakish company; he associated with respectable whites in the neighborhood; was often at their balls and parties, assemblies and little gatherings, where no free negro was allowed to associate with the whites, and dined with the whites just the same as any gentleman would have done. Witnesses have both been at these balls, &c. with Jim Nunez, and have seen him dancing there. Mary Harrel thinks she has danced on the same floor with him, but not as a partner, so far as she remembers. Both witnesses say that Jim Nunez fellowshipped with the whites at all such places and elsewhere in the neighborhood, just the same as any one else; he was always regarded, not a negro, but as of mixed Indian and white blood. Witnesses feel sure

that if he had been regarded as a negro, he would not have been permitted to associate, in the manner he did, with his neighbors. It was not believed, so far as witnesses know, that Jim Nunez had any negro blood in him. Witnesses never heard any body, in those days, charge him with being disgraced that way; when they knew Jim Nunez, his permanent residence was in Georgia, Burke County, so far as they knew, though he was very often over in South Carolina, and sometimes stayed there a month or two or three months; witnesses are not certain as to the length of time.

Witnesses knew nothing of Jim Nunez moving any where; knew nothing at all about Joseph Nunez or any of the younger set; they never knew of Jim Nunez associating with negroes, free or slave, or of his being regarded by his neighbors as having any negro blood in him. Know nothing else that will benefit the defendant.

Knew nothing at all of Joseph Nunez. Stephen Newman has seen Joseph Nunez, but knew nothing of his blood, nor did he know who was his father or mother. Mrs. Harrel does not remember ever having seen Joseph Nunez. Witnesses never knew what Joseph Nunez said about himself or what he considered himself to be, nor what he was considered by his neighbors; they only knew Jim Nunez. Mr. Bryan, witnesses say, came to their house one day last month and asked them if they knew any thing about Jim Nunez; they answered him as they testified above and he told them he would probably have their interrogatories taken; this is all they know about the way in which he came to take their interrogatories; the last and the first time they ever saw Mr. Bryan was at that time, which was, to the best of their recollection, the latter part of August. No one present at the execution of commission besides commissioners and witnesses, except a son of Mrs. Mary Harrel.

Defendant then tendered and read in evidence a deed from Joseph Nunez to Alexander H. Urquhart for Patience and her children, bearing date the twentieth day of December,

1846, and founded upon the consideration of friendship; also a bill of sale for the negroes in dispute, from Alexander H. Urquhart to Seaborn C. Bryan, dated the eighteenth day of February, 1847, for the consideration of twelve hundred dollars; also the following admission:

" We admit that Joseph Nunez never enrolled himself as a free person of color, in the Clerk's Office of the Inferior Court of Burke county.   Oct. 24th, 1855.

(Signed)       SAM'L D. KILLEN, Plaintiff's Att'y."

Here defendant closed his case and plaintiff offered in rebuttal of defendant's testimony the interrogatories of Charles and Joseph Cosnahan, Thomas Cosnahan and Charles Ward, to the reading of which defendant's Counsel objected, upon the ground that they were cumulative of the plaintiff's evidence and not in rebuttal of defendant's evidence; which objection was over-ruled by the Court and defendant's Counsel excepted.   Plaintiff's Counsel then read in evidence the interrogatories and answers of Charles and Joseph Cosnahan, Thomas Cosnahan and Charles Ward, who testified :

1st. CHAS. COSNAHAN answered, that he did not know the parties; he knew James Nunez, Alex. Nunez, his brother, and has seen Fanny Galphin, the sister; he knew them in Burke county, Ga.; first knew James Nunez in 1807 until his death; knew him from seeing him, as he was acquainted with any one else in the neighborhood; they passed in the neighborhood as free colored persons; did not know what their blood was; did not know what proportion of mixed blood they had; their appearance indicated negro blood; does not know what their blood was; Joseph Nunez was lighter than Jim; Jim Nunez was not much brighter than a half breed white and negro; does not recollect the appearance of their features; they were regarded as free negroes; does not think they voted or performed military duty; thinks they exercised no other rights than those of free negroes; free white citizens associated with them as if they were free

megroes; does not recollect what position they assumed for themselves; does not recollect whether they had guardians or not; has never seen Seaborn Bryan as he recollects; has stated all he knows.

Left Ga. in 1817, and only knew Jos. Nunez when he was quite small; is 68 years old; lives in Barnwell Dist. S. C. Jas. Nunez had tolerable kinky hair, that is, it was disposed to curl; black hair; does not recollect his features; did not have a fair complexion.    Only testifies from the reputation the Nunez's bore in the neighborhood, their appearance and his opinion from having seen them; did not know the mother of Joseph Nunez; had been told she was a free, white woman. Alexander McKenzie, William C. Mosely, Joseph Mosely and Lucy Mosely are present at the taking of answers.    His brother, Thomas Cosnahan, has conversed with him; has never seen Bryan; knows nothing else.

JOSEPH COSNAHAN answered: He did not know the parties; knew James Nunez and his brother Alexander and sister Fanny Galphin; knew Joseph Nunez when he was a boy; knew them in Burke Co. Ga. between 1807 and 1817; knew them as he would any close neighbors in a thinly settled country; was often with them; they were mulattoes—that is, white and negro mixed; does not know what was the proportion of mixed blood; has seen the mother of James Nunez, she was very dark; does not know the proportion of mixed blood; they had hair which curled, does not recollect their features, but their general appearance indicated them as mulattoes.

The complexion of James Nunez was quite dark; that of Joseph Nunez was pretty dark, with fringed hair; never knew of their exercising the usual rights of white citizens; they considered themselves as mulattoes; James Nunez was an educated man and mixed sometimes with white men; they were regarded in the neighborhood as mulattoes; the white citizens associated with them and regarded them as mulattoes; they regarded themselves as free mulattoes; does not know, of his own knowledge, that they were under guardian-

ship; has never seen Seaborn C. Bryan. Knows nothing else.

Witness is 66 years old; resides in Edgeworth Dist. So. Ca. James Nunez had black hair, which curled; does not recollect his nose or cheek bones; his complexion was dark; he testifies from his acquaintance with the Nunez family, their appearance and the reputation of the neighborhood they and witness resided in; that he has been told the mother of Joseph Nunez was a free white woman; don't know of it of his own knowledge; that Alexander McKenzie, Lemuel Glover and J. H. Igée are present at the taking of his answers. His brother, Thomas Cosnahan, has conversed with him upon this case; has never seen Bryan; knows nothing of benefit to defendant.

CHARLES WARD answers: Knows Hughes Walton and has seen S. C. Bryan; knows Joseph Nunez, knew him from his infancy till a few years before his death; he lived in Burke Co. Ga.; he was a mulatto; he knew the mother, father, uncles and aunt of Joseph Nunez; knew the mother, father and aunt of Joseph Nunez well fifty years ago; knew Joseph Nunez when an infant; Joseph Nunez was of mixed blood; his grand-mother was a wooly headed mulatto; James Nunez, the father of Joseph, was darker than his, James' mother; Joseph Nunez' aunt Fanny Galphin, the sister of James Nunez, was rather darker than James. Alexander Nunez, the brother, was lighter; the whole race showeth the negro in their features; does not know what was the proportion of mixed blood in them; believes that the grand-mother of Joseph was half negro, and thinks that James was more than half; knows these facts from his own knowledge and the reputation of the neighborhood; has answered in a previous answer that they were regarded as free negroes; they were put on the footing of free negroes. Joseph Nunez regarded himself as a free negro; he had one of his own negro women, Patience, as his wife. Has stated all he knows.

Joseph Nunez's mother was a free white woman; James Nunez was a dark mulatto, thin nose and tolerable high cheek

bones; Nanny, the mother of Patience, and Joseph Nunez himself, lived at Fanny Galphin's; does not recollect the date of Fanny Galphin's possession of Nanny; Fanny Galphin did get said negro from her brother, James Nunez; Fanny Galphin kept Nanny and Joseph Nunez until her death; witness does not know whether Joseph Nunez had possession of said negro Nanny previous to the death of Fanny Galphin; Nanny was first in the possession of James Nunez; then Fanny Galphin; after her death, then in Joseph Nunez's possession; recently in Mrs. Mary Rogers'; has told all he knows.

THOMAS COSNAHAM answers, knows Hughes Walton; has seen Seaborn C. Bryan, but has no acquaintance with him; knew Joseph Nunez; first saw him about 1830; knew him from then until his death; he resided near witness' father's in Burke County in 1815, and lived in Burke County; he was a mulatto; thinks he had negro, Indian and white blood in him; he died about 1850; Joseph Nunez was of mixed blood; knew James Nunez, who was said to be the father of Joseph Nunez, who was a dark mulatto; knew him in 1807 or 1808; James Nunez's mother was about half negro and Indian, the sister of James Nunez; Fanny Galphin was about the same color as James Nunez; James Nunez' brother, Alexander, was lighter than James Nunez and Fanny Galphin; they were all considered mulattoes; his means of knowledge was by seeing them and their being reputed mulattoes in the neighborhood in which they lived; does not know what proportion of mixed blood was in them; the mother of James Nunez was quite dark; knew James Nunez in Burke County; knew Fanny Galphin, Alexander Nunez and their mother in 1814 or 1815 in Burke County; does not recollect their features. Joseph Nunez and his ancestors were, according to his knowledge, regarded and esteemed free mulattoes; does not think they were regarded as free white citizens; they were generally treated as free negroes, according to his recollection and knowledge; Joseph Nunez regarded himself as a free mulatto; does not know who his wife was; has sta-

ted all he knows going to show what was Joseph Nunez's blood.

Did not know Joseph Nunez's mother; has always under-stood she was a white woman; does not think James Nunez had smooth hair; he wore it long, and it was inclined to curl; thinks he had thin nose, high cheek bones and a dark complexion; that is, a dark mulatto complexion; in 1814 and 1815 Nanny lived at Fanny Galphin's; witness thinks that Joseph Nunez was also there; does not know how Fanny Galphin got said Nanny; does not know how long she kept Nanny; Joseph Nunez had Nanny in 1829 or 1830; Fanny Galphin was then dead; last knowledge of them from 1815 to 1829 or 1830; did not know Patience; moved from Burke County in 1815 to South Carolina, and moved back to Burke in 1829; saw Nanny in possession of Fanny Galphin, sister of James Nunez, in 1814 and 1815; she was in possession of Joseph Nunez in 1829 or 1830; after the death of Joseph Nunez, Nanny was sold to Mrs. Mary Rogers; he knows no more.

Plaintiff then tendered an exemplification from the Inferior Court of Burke County, to which defendant's Counsel objected, because it did not appear that the application was made, and the order passed at a regular term of the Inferior Court of Burke County; because the application made by Joseph Nunez did not represent him as a free person of color; and because it did not appear that the person appointed had complied with the order, and given bond and security; and the proceeding being *coram non judice* and void, was only hearsay testimony; which objection was over-ruled, and defendant's Counsel excepted; whereupon, said exemplification was read to the Jury, as follows:

GEORGIA, BURKE COUNTY:

WAYNESBORO, Monday, 3d July, 1843.

The Honorable the Justices of the Inferior Court met this day, pursuant to adjournment. Present their Honors, James W. Jones, William W. Hughes and John W. Carswell, Esqrs.

Bryan *vs.* Walton, adm'r.

Joseph Newnes petitions the Honorable the Inferior Court of Burke County to appoint Alexander H. Urquhart his guardian.

his

JOSEPH F. ⋈ NUNES.

mark.

Samuel J. Urquhart.

I consent to act as guardian.    A. H. URQUHART.

Upon the petition of Joseph Nunez, a free person of color, praying that Alexander H. Urquhart be appointed his guardian, and the said Alexander H. Urquhart consenting, it is ordered that he be appointed guardian on his giving bond and security in terms of the law.

Georgia, Burke County:

Clerk's Office Inferior Court.

I, Edward Garlick, Clerk of the Inferior Court of Burke County, do hereby certify that the above is a true copy of and extract from the minutes of said Court, appointing Alexander H. Urquhart guardian of Joseph Nunez, a free person of color.

Witness my hand and seal of office of said Court at Waynesboro, this 17th day of October, 1851.

EDWARD GARLICK, Clerk. [Seal.]

Here the plaintiff closed his case, and both parties having addressed the Jury, plaintiff's Counsel requested the Court to charge the Jury—

1st. That if they believe from the evidence that Joseph Nunez, the intestate of plaintiff, was a free person of color, having at least an eighth of African blood, and that the father of the said Joseph Nunez, James Nunez, owned Nanny, the ancestor of Patience and her children; that Joseph Nunez was the only child of James Nunez; that James Nunez died previous to the year 1818, and that Joseph Nunez is or was

the only descendant of James Nunez ; and that Hughes Wal-ton, the plaintiff, is administrator on the estate of Joseph Nu-nez ; then they will find for the plaintiff, for the Acts of 1818 and 1819 cast the property upon Joseph Nunez, and the pro-perty vested in him at the death of his father.

2d. That if the Jury believe Joseph Nunez was a free per-son of color, having one-eighth African blood in his veins, the only descendant of James Nunez ; that James Nunez owned Nanny, the ancestor of Patience, and her children, the Acts of 1818 and 1819 cast the property on Joseph Nunez, and it matters not, under said Acts, whether Joseph Nunez's mother was a free white woman, or a negro, or mulatto.

3d. That the laws of inheritance and descent, as between free white persons, or as to illegitimate free white persons, have no application to the condition of free negroes, as con-templated by the Acts of 1818 and 1819.

4th. That if the Jury believe, from the evidence, that Jo-seph Nunez was a free person of color, having one-eighth Af-rican blood in his veins, he was incapable to sell or give away his property ; and therefore, the deed from him to Ur-quhart is null and void ; that he could neither sell or give away his property by deed or will, and that it is and was by the Acts of 1818 and 1819, alone, that he held or could hold it ; that by those Acts he held for life only, and at his death, it descended to his descendants.

All of which requests were given in charge by the Court ; and to each and all of which defendant, by his Counsel, ex-cepted and now excepts.

Defendant, by his Counsel, then requested the Court to charge the Jury—

1st. That Walton is in no better situation, so far as this suit is concerned, than his intestate, Joseph Nunez, would be if in life ; that Walton must recover upon the strength of his own title, and not upon the defects of Bryan's title ; that if Walton's title is not good, it does not concern him whether Bryan's title is good or bad ; that Bryan's possession is suf-

ficient to protect him against any claim founded upon a defective title.

2d. That if the Jury shall believe that Joseph Nunez was a free person of color; that is, of mixed negro and white blood, or negro and Indian blood, then, before they can find for Walton, they must be satisfied that Joseph Nunez' title to the property vested prior to the Act of 1818.

3d. They must, however, be satisfied from the testimony, before they can place Joseph Nunez under the disability of a free person of color, that he had one-eighth negro blood in his veins, for the law will not presume, in the absence of proof, that a person is under this disability.

4th. That if, under these rules, they shall not be satisfied that Joseph Nunez was a free person of color having negro blood, then he had a right to dispose of his property; and his deed to Urquhart, unless impeached for fraud, is valid and binding, and the deed from Urquhart to Bryan is also valid; and this although Bryan may not have paid full value for the property; that the character of the consideration is all that the Jury can inquire into—if it was valuable, that is enough—with its sufficiency they have nothing to do.

5th. That if Joseph Nunez be found to be a free person of color, and to have acquired a right to this property, or the ancestor of property subsequent to the passage of the Act of 1818, by sale, exchange or other means, then no title to the property vested in Nunez, and the outstanding title will be sufficient to defeat this action.

6th. That it is the duty of the Jury to reconcile, if possible, the testimony of all the witnesses, so as to impute perjury to none; but if this cannot be done, credit is to be given to all who are consistent with themselves, rather than to others who, at different times, under oath, give contradictory accounts of the same circumstances, and that when witnesses testify falsely in one thing, they are to be altogether disbelieved, unless in so far as they shall be corroborated by other testimony.

7th. That where an equal number of witnesses, equally credible, testify differently about the same facts, then neither one side nor the other has a preponderance in his favor, and it is as though no testimony was introduced as to the facts, and the Jury are not authorized to assume such facts as proven.

8th. That if the Jury shall believe, from the testimony, that the father of Joseph Nunez had one-fourth negro blood in him, and that his mother was a free white woman, then the connexion between the parents was meretricious, not matrimonial, and the offspring of the connexion was illegitimate.

9th. That the illegitimate child by a father who is a free negro, or mulatto and a free white mother, can inherit only from the mother; that he cannot take from the putative father under the Statutes of descents relating to either free white persons or free persons of color; and that if he derived title to the property in dispute, or the ancestors of the property from his father, then he must have acquired the title by purchase, by gift or by will; but in the absence of any proof going to show the terms of the purchase, the gift or the will, they cannot indulge in conjecture as to such contents, and presume them.

10. That other things being equal, most weight is to be given to the testimony of those witnesses whose means and opportunity of knowing the facts and circumstances to which they testify were best, and who have gone into particulars and details in their testimony, and have not deposed as to general statements, facts and opinions, and who give the best reasons for their opinions.

11. That if the Jury shall be of opinion that Joseph Nunez was not registered under the provisions of the Acts of the Legislature of this State as a free person of color, (mixed negro and white, or negro and Indian,) and that no effort was made to subject him to the penalties prescribed by those Acts, that these are circumstances from which they may infer that he was not such a free person of color as is disabled from owning, controlling, managing, selling and conveying

slaves under the Act of 1818. That if Joseph Nunez was an Indian, or of mixed white and Indian blood, then he had a right to convey the negroes in dispute to Urquhart, and Urquhart to Bryan.

All of which charges the Court refused to give, except the 1st, 4th, 6th, 7th and 10th, but charged the Jury, in substance, that the presumption is, that a free person of color is of negro extraction; if Joseph Nunez was considered a free person of color, it is to be presumed he had more than one-eighth negro blood.

The third request of defendant's Counsel reversed the rule. In giving the 4th request in charge he stated, "but his being a free person of color vacates the deed." After refusing the 5th request of defendant's Counsel, he stated, "if this property was owned prior to 1818, the family of the Nunez's could exchange among themselves; that free negroes could not buy from others so as to increase the number of slaves owned by them, but that they might trade among themselves for slaves;" that a free negro could not inherit from an uncle or aunt; the term descendants included collaterals, and the property might ascend as well as descend, both as to lineals and collaterals.

In refusing the eleventh request of defendant's Counsel, he charged, that if a person had any negro blood, he was disabled from conveying slaves; and in answer to a question propounded by a Juror, "what is a free person of color?" he replied, that a free person of color is one who has some negro blood; that Indians, in the meaning of the Statutes, are not free persons of color.

The latter clause of the 11th request of defendant's Counsel, commencing with the words, "that if Joseph Nunez was an Indian," &c. was given in charge; to all of which charges and refusals to charge, defendant, by his Counsel, excepted; and upon these several exceptions error was assigned.

Bryan *vs.* Walton, adm'r.

WARREN & HUMPHRIES; GILES; MILLER & HALL, for plaintiff.

SAMUEL D. KILLEN, for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] [2.] The two first objections may be considered together. They assume that letters of administration should show upon their face that they were granted to a free white citizen; and consequently, that it is inadmissible by parol to add to or contradict them, by proving that the intestate was a free person of color.

The letters, of themselves, show nothing. The most that can be contended for is, that the presumption of law is, that they were granted upon the estate of a free white person. Now presumptions of law are of two kinds: *First*, such as are made by the law itself; or, as they are called, presumptions of *mere law*. *Secondly*. Such as are to be made by a Jury, or presumptions of *law* and *of fact*. Again. Presumptions of *mere law* are either absolute and conclusive: as for instance, that a bond or other specialty was executed upon a valid consideration cannot be rebutted by evidence, so long as the presumption is not impeached for fraud; (4 *Burrow*, 2225;) or they are not absolute, and may be rebutted by proof. And such is the character of the presumption arising from the face of these letters. The presumption of law is, that they were granted upon the estate of a free white person. Still, this presumption is not conclusive, but is capable of being rebutted or susceptible of explanation by the testimony.

[3.] [4.] The next two assignments of error may also be disposed of together.

Was it competent for the witnesses, Joseph Bush and Mary Rogers, to testify as to the general reputation in the

neighborhood where he resided, that Joseph Nunez was a free person of color, and that such was their own belief?

Mr. *Greenleaf* says : "Upon the same principle it is considered that evidence of general reputation, reputed ownership, public rumor, general notoriety and the like, though composed of the speech of third persons, not under oath, is original evidence, and not hearsay, the subject of inquiry being of many voices to the same fact." (1 *Green. Ev.* §101.)

As to the opinion of the witnesses, it was given in connection with and as a mental deduction from all the facts which come within their knowledge, and to which they had deposed.

[5.] Defendant's Counsel objected to any evidence, that Joseph Nunez took and held the property in dispute by descent, it appearing that he claimed it under the will of James Nunez, his father, and Fanny Galphin, his aunt; and which wills were not produced.

This exception assigns to the plaintiff a position which he refuses to occupy. Joseph Nunez does not derive title to these slaves under and by virtue of the testaments of these ancestors. On the contrary, he claims by descent. The contents of the wills were not elicited at his instance nor for his benefit, and were very properly suppressed by the Court.

[6.] Was there any evidence to establish that the title of Joseph Nunez accrued prior to the Act of *December*, 1818 ?

A non-suit was moved, on the assumption that there was no such proof. And the ground was well taken, provided the facts substantiated it. Because, if the title did not accrue prior to that Act, it could not be acquired subsequently. But the record does not warrant the assumption. On the contrary, not to cite any other fact, it shows that James Nunez died in 1809 ; that Nanny, the mother of Patience, went immediately into the possession of Fanny Galphin, his sister; that Fanny Galphin died in 1817, or the beginning of 1818, and that Nanny then passed into the possession of Joseph Nunez.

Besides, it is in proof that Fanny Galphin never did, in fact, own Nanny; that after the death of her brother James,

and while she had possession of this woman, she was always considered as belonging to Joseph Nunez; and he derived his title directly from his father.

[7.] Was the Court right in allowing plaintiff to submit to the Jury the testimony of Ward and the two Cosnahans?

Plaintiff had made out a *prima facie* case. It had been assailed vigorously by the defendant; and the purpose of this proof was, to fortify his title, thus attacked. It was, we apprehend, competent to do so. It is a matter of every day practice in the Courts.

[8.] Should the exemplification from the Inferior Court of Burke County have been admitted in evidence? Surely, for as much as it was worth. What signifies it that the proceeding was not at a regular term; and that the order passed, omitted to recite that the applicant, Joseph Nunez, was a free person of color; and that it did not appear that the guardian appointed, did give any security in terms of the law, still it tended to demonstrate that Jos. Nunez considered himself, and was so considered by the Court, a free person of color. The proceeding took place in 1843, and as Jos. Nunez must have been born prior to the death of his father, in 1809, or within the usual period of gestation thereafter, he was upwards of thirty years old at that time. He was not, therefore, entitled to a guardian as a minor. It never was pretended that he was a lunatic. The proceeding, then, must necessarily have been based upon the fact that he was a free person of color; and it was so understood by the Court and every body else at that time.

[9.] We see no error in the principles laid down in the first, second and third requests made by the plaintiff's Counsel and charged by the Court. As to the fourth, my brother BENNING and myself differ in opinion. While he holds with this Court, as I understand him in the position taken when this case was up before, (14 *Ga. R.* 198,) that " the *status* of the African in Georgia, whether bond or free, is such that he has no civil, social or political rights or capacity whatever, except such as are bestowed on him by statute," yet he in-

sists that the power of a free person of color to dispose of slaves, by sale or otherwise in this State, is conferred, or rather, perhaps, is to be inferred from existing legislation.

I have no disposition to re-argue this question on my part, but beg leave to refer to the opinion of this Court just cited. I would merely add that were the right in question plainly deducible from other acts, which I maintain it is not, still I should hold that the Act of 1819 is a limitation or restriction upon this power. The title to these slaves or to any other owned by free persons of color, must have accrued anterior to 1818. And the Act of 1819 declares that all such " *shall* remain in the owner or in his or her descendants after his or her death." (*Prince,* 799.) So soon, therefore, as the *descendants* of Joseph Nunez were cut off or before extinct, in which line alone the title could be transmuted, and that, too, by operation of the Statute, the title became forfeited to the State.

[10.] We see no reason why the Court refused to give in *totidem verbis* the second and fifth charges, as requested by defendant's Counsel, namely: that if Joseph Nunez was a free person of color, that is, of mixed negro and white blood, or mixed negro and Indian blood, that before Walton, his administrator, could recover, it must be shown that the title of his intestate to the negroes vested prior to 1818; and that if it originated subsequent to that time, the plaintiff must fail. By law, all titles to slaves which had not vested at that date, were forfeited. And that being the case, it would be needless and improper to inquire into the validity of the defendant's title. Bryan's possession would be sufficient to protect him against any other than the true owner.

[11.] We do not concur with Counsel for the plaintiff in their view of the law as set forth in the *eighth and ninth* requests to charge. On the contrary, we hold that under the Act of 1819, property can be transmitted by descent to the illegitimate offspring of the father, provided they be free persons of color, whether the mother be a free white woman, an

Indian or a free person of color. Such, we *believe*, was the intention of the Legislature.

[12.] The eleventh request should have been complied with. The fact that Joseph Nunez did not register himself as a free person of color, if it exists, and that notwithstanding said failure or refusal, no effort was made to subject him to the penalty prescribed by law for such conduct, was certainly a circumstance, slight though it may be, which the Jury had a right to weigh, on the trial of the issue submitted to them.

[13.] We are not prepared to indorse the doctrine enunciated in the instructions of the Court, to the effect that "if a person has any negro blood, he is disabled from conveying slaves." On the contrary, we should say that to put him under such a disability, he must have one-eighth of African blood in his veins. If he is descended from one who stands further off than the third degree or generation to him or her who was or is not a free white citizen of this State, or of any other State whose Constitution and Laws tolerate involuntary servitude, he may exercise all the rights and privileges of a freeman: and amongst the rest, may contract and be contracted with as to slaves or any other species of property. (*Cobb*, 531.)

[14.] Nor do we subscribe, in the last place, to the proposition, that the term "descendants" in the Act of 1819, includes *collaterals;* and that slaves held under that Statute "might ascend as well as descend both as to lineals and collaterals." "Descendants" says *Bouvier*, "are the posterity or those who have issued from an individual, and include his children, grand-children and their children to the remotest degree." (1 *Law Dic.* 448, *citing Ambler*, 327; 2 *Bro. C. C.* 30; *Id.* 230; 3 *Bro. C. C.* 367; 1 *Rop. Leg.* 115;) and again: "The descendants from what is called the direct descending line. *The term is opposed to that of ascendants.*" (*Id.*)